IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JILL TRAXLER,                               )
                                            )
                     Plaintiff,             )        Civil Case No. 06-1450-KI
                                            )
       vs.                                  )        OPINION AND ORDER
                                            )
MULTNOMAH COUNTY,                           )
                                            )
                     Defendant.             )
_____        )

       Daniel Snyder
       Matthew Lackey
       1000 S.W. Broadway, Suite 2400
       Portland, Oregon  97205

              Attorneys for Plaintiff

       Agnes Sowle
       County Attorney
       Multnomah County, Oregon
       Jenny M. Morf
       501 S.E. Hawthorne Blvd., Suite 500
       Portland, Oregon  97214

              Attorneys for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiff Jill Traxler, a long-term employee with Multnomah County, was laid off, took a position that was a demotion, and was terminated during the 120-day trial period for the new position. Traxler alleges the layoff and/or termination were based on her age, her disability, her use of the family leave laws, or in retaliation for being a whistleblower about financial waste in her department. Before the court is Defendant's Motion for Summary Judgment (#34). For the reasons below, I grant summary judgment in part but allow some of the family medical leave claims to proceed to trial.

## PLAINTIFF'S EVIDENTIARY AND PROCEDURAL OBJECTIONS

Traxler made a procedural objection to much of the evidence the County submitted with its reply brief. She objected that the evidence constituted new facts which did not reply to her response. I addressed this objection by allowing Traxler to file an affidavit in sur-reply.

Traxler also objected to some of the County's evidence filed in support of its opening brief. I reviewed all of these objections but decline to rule individually on them. Some object to evidence on which I do not rely. I am unpersuaded by any of the other objections and will address two general categories. First, concerning several pieces of evidence discussing Traxler's layoff due to budget cuts, she objected that the evidence lacks foundation and calls for speculation. The evidence is from people who made the decision, such as Larry Aab. It does not become speculation because Traxler believes the stated reason is a pretext for discrimination. Second, Traxler objected to many exhibits authenticated by Travis Graves, Interim Director of Central HR. In that role, Graves is able to authenticate the exhibits sufficiently.

## FACTS

I.    <u>Background Leading to Traxler's Position in Payroll</u>

Jill Traxler began working at the Multnomah County Sheriff's Office ("MCSO") in 1987 and was promoted into management in Human Resources ("HR") in 1998. MCSO has its own HR unit. Human resources for the rest of the Multnomah County agencies is provided by Central HR.

Prior to Bernie Giusto's election, Nina Bisson was the Director of HR. Giusto did not keep Bisson in her position after he took office. Bisson and Traxler were instructed by Tim Moore to train Jennifer Ott to eventually become the new Director of HR. Traxler was aware that Ott had previously quit a Recruitment Specialist job because it was too hard. Moore told Bisson to hire Ott back to work in HR. Traxler characterizes Ott as much younger than Traxler, very attractive, and very popular with the male managers. Traxler did not believe that Ott had the necessary knowledge, skills, or training to be the Director of HR.

In January 2003, Giusto took office as the Multnomah County Sheriff. After taking office, Giusto made Larry Aab the Director of the Business Services Division, which includes Payroll, HR, Finance, and Information Technologies. Ott became the Director of HR, and Wanda Yantis became the Manager of Fiscal and Payroll. Traxler did not apply for the Director of HR position to which Ott was appointed. Moore was Chief Deputy of Administrative Services and later Chief of Corrections. Some of these people, including Ott, worked on Giusto's transition team.

During her tenure, Bisson saw the MCSO act inconsistently in allowing some employees to retain their jobs after using up family medical leave time. Some were allowed to return or to

retire after taking much more time off than provided by statute. Bisson supervised Traxler and spoke to Chief Deputy Moore about her. It was clear to Bisson that Chief Deputy Moore did not want Traxler to have an HR management position in the MCSO. Bisson participated in MCSO budget meetings concerning the impact of budget cuts on particular employees. Some employees and positions were off limits for cuts. Bisson observed the MCSO use the budget process as a way of getting rid of employees "that were unpopular and that management did not want to keep." Bisson Decl. ¶ 17. Bisson, who had supervised Ott, did not think that Ott was competent to take over the HR Director position.

Once Ott was appointed to HR Director, Traxler worked in MCSO HR under Ott's supervision. Traxler also participated in MCSO budget meetings where the impact of budget cuts on particular employees was discussed. Traxler observed upper management, including Aab and Moore, protect certain employees and use budget cuts to get rid of employees that they did not want to keep. Moore also instructed HR to work around County rules at times to give special treatment to preferred employees. Traxler witnessed Moore treat family leave inconsistently. Employees he favored were allowed to retain their jobs after using up their medical leave but others lost their jobs. Traxler believes that Moore wanted her out of an HR management position because she tried to apply HR rules equally for all employees. Moore made snide comments about Traxler and her skills.

On February 14, 2005, Aab transferred Traxler to manage Payroll full time under the supervision of Wanda Yantis. Traxler's title remained HR Manager 1 and she supervised four or five employees. Aab made the decision but informed Giusto and the command staff, including Moore, Chief Deputy of Law Enforcement Lee Graham, and Debby Kennedy. Aab believed that

Traxler's management and interpersonal skills would be an asset to Payroll. Traxler was concerned because the last four employees who had managed Payroll had their positions cut from the budget. Traxler also was not allowed to move her desk to Payroll and had to keep working from her desk in HR. Ott told Traxler this was so she could continue to answer questions from Ott and the HR staff. Traxler was not given any storage space for her Payroll materials and was characterized by Ott and Moore as messy.

II.   Layoff from the Payroll Position

The County budget in its entirety must be approved by a majority of the Board of County Commissioners. MCSO has had budget reductions every year since 1999. Moore endorsed the package of budget cuts and Giusto made the final decision to cut Traxler's position, based on Aab's recommendation. The 2005 budget cut three management positions, including Traxler's. Traxler could have stayed in the MCSO by accepting a previously-held classification in a low-level clerical position. Under the personnel rules, Traxler could not bump into a County position outside the MCSO.

On June 13, 2005, Traxler was called into a meeting with Aab and Ott. Aab told Traxler that he decided to cut her HR Manager 1 position, effective July 1, 2005, as part of some budget cuts. Aab thought Traxler had done a good job in Payroll but he had to eliminate a position for budget reasons. Aab knew that Traxler was approved for family medical leave but did not know the reasons for it. He did not consider Traxler's age, medical condition, or the fact that she had taken family medical leave. Aab was unaware that Traxler suffered from any disabling condition during her employment.

During the meeting, Aab placed Traxler on paid administrative leave and told her that she had to leave the premises immediately. Traxler claims that administrative leave is usually reserved for employees under investigation for misconduct. Carol Hasler, a Captain in Internal Affairs and Inspections, also attended the meeting and escorted Traxler out. Traxler was allowed to return to her desk with Hasler only briefly and could not collect her personal belongings, which were photographed, boxed, and brought out to Traxler's car on a later date. Some items were never returned. Carol Nykerk was also laid off and escorted from the building. In the four years that Aab has been laying people off, he has had them all escorted out of the building by a uniformed officer. It is unclear if Aab has laid off anybody other than Traxler and Nykerk. Traxler submitted affidavits from other MCSO employees who saw people laid off but given time to say goodbye without an escort from the office. The affidavits do not state whether this occurred during Aab's tenure or prior to it.

Traxler believes that her age was a factor in her layoff because of conversations with unnamed people that she was rigid, inflexible, and old school and that they wanted things done new ways. Ott told Traxler that people perceived Ott as more malleable than Traxler because Ott was younger.

According to Yantis, Traxler's position was never added back into the MCSO budget, even though Payroll still completed the payroll function for 830 employees. Some of Traxler's duties were reassigned to other parts of the MCSO but the majority of Traxler's functions were transferred to Yantis. In February 2006, Yantis realized that she needed assistance with some of the daily operational supervision of Payroll. She assigned some of the function to Lori Sander but kept the majority of Traxler's duties. Yantis does not think that Sander's responsibilities are

anywhere nearly as comprehensive as Traxler's were.  Sander is an Admin Analyst Senior, a

lower classification than the HR Manager 1 classification Traxler held when she was in Payroll.

Traxler disputes Yantis' explanation of what tasks Yantis performs.  Traxler relies on the

traditional functions of Yantis' job classification, Program Manager, the nature of some of the

tasks as they were performed by Traxler, and an email Traxler received from Sander on

October 13, 2005.  In the email, Sander explained how she was trying to convince Aab to assign

supervisory duties in Payroll to her.

On February 28, 2006, Yantis sent an email to Central Payroll informing them that Lori

Sander was appointed as Payroll Supervisor, a position vacant since June 2005.  Later that day,

Ott responded to Yantis' email with the following email:

> Actually, Wanda, this probably shouldn't have been sent out the way it
> was and if it somehow lands in Jill Traxler's hands we will have to dispute the
> language and we do have a pending tort claim yet to deal with.  I know it's a
> technical piece but relevant nonetheless.  Jill was the Payroll Supervisor (working
> title) and her position was cut in the layoff; so that position technically went away
> and hasn't been vacant as you said in this email.

> Lori is temporarily working out of class as an Admin Analyst/Sr. exempt,
> which includes some supervisory roles, until we can define what her role really
> is/needs to be and make a decision from there.  She is not the payroll supervisor
> and we cannot call her that, working title or not.

Snyder Aff. Ex. 13 at 1.

At the time of the layoff, Traxler was 46 years old, Sander was 39 or 40, and Yantis was

51.

III.    Termination from the Central HR Recruiting Position

Immediately after being laid off and leaving her unit, Traxler went to Central HR to apply

for a job that Ruth Nutting, a supervisor in that unit, told Traxler about a few weeks earlier.

Page 7 - OPINION AND ORDER

Carol Brown was the Labor Relations Manager in Central HR and Travis Graves was the

Director of Central HR.  Traxler told Prudence Veach and Nutting in Central HR that she would

like to take the HR Analyst 2 position in Recruitment.  Veach told Traxler that she did not want

her in the job because Recruitment was to be broken up and restructured and Veach did not want

to train someone.  During the two hours Traxler spoke to Nutting and Veach, Hasler waited for

Traxler.  Hasler eventually asked to speak to Nutting and told her that Traxler had to turn in her

identification and leave because she was prohibited from being in the County Administration

building.  This embarrassed Traxler because Veach and Nutting looked at Traxler as if she were

dangerous.

Brown and Graves agreed to hire Traxler effective June 30, 2005.  Managers in Central

HR knew Traxler was taking medical leave when they informed her about this open position and

offered her the job.  Graves was aware that Traxler was over 40 years old but did not know that

she suffered from any disabilities.  The position was a demotion from Traxler's HR Manager 1

position in the MCSO.  The June 30, 2005 letter from Brown confirming that Traxler accepted

the voluntary demotion also stated that there was a 120-day trial service period and that Traxler

waived all layoff, bumping, and recall rights with respect to her layoff.  Traxler received an

earlier undated version of this letter that did not include the sentence about the trial service

period.  Traxler took the Central HR Recruitment position so that she could keep working.

Veach and Nutting supervised Traxler.

Nutting claims she was unaware that Traxler suffered from a physical or emotional

illness.  Traxler states that she told Nutting about all of her mental illnesses when Bisson was

supervising Traxler.  Nutting told Traxler that Bisson sent Nutting to question why Traxler had so many medical appointments, made so many lists, and hoarded documents.

In the new Recruitment position, Traxler's training from Nutting and Veach did not go well.  Traxler believes that the training methods Veach employed were inadequate in addition to the fact that Veach had little time to work with her.  Nutting and Veach told Traxler that she could only direct questions to them.

On September 7, 2005, Traxler was evaluated as "unacceptable" in a performance review for the HR Analyst 2 position in Central HR Recruitment.  The four-page review gave numerous examples of tasks which Traxler did not complete correctly.  Traxler provided a written response, to which Nutting and Veach responded.  Traxler noted that between June 30 and August 31, she worked 155.75 hours and took the remaining time on FMLA leave.  Traxler thought she had been on leave more than she had been at work during the period.  She believed that her performance was more accurately characterized as marginal.  On September 26, 2005, Traxler was terminated by Carol Brown effective October 17, 2005 for failure to perform at a satisfactory level.  Traxler was 46 years old at the time.  Brown knew that Traxler was approved for family medical leave but did not know the reasons for it.  Traxler had no interactions with Brown during her employment.  By the end of 2005, the County disbanded the centralized recruitment function.

IV.    Family Medical Leave and Disability Information

While still employed, Traxler took family medical leave for her own medical problems and to care for her mother and her partner.  Much of the leave was intermittent leave due to the caregiver nature of Traxler's responsibilities with her family members.  Traxler states that she

was allowed to take all of the leave she requested but that people were critical of her taking the time off.

In 2004, Traxler took medical leave for her own serious physical health condition, a herniated disc in her neck. Ott was the Director of HR at that time. Ott sent HR employees to talk to Traxler about the number of family medical leave claims she had made. Ott told the employees to tell Traxler that she had more medical leave claims than any other employee in the history of the MCSO. Traxler claims this was untrue and made her feel singled out and demeaned because the conversation was structured to make her feel she was shirking her management responsibilities.

When Traxler was out for leave due to her mother's medical emergency, Veach told her, "You dropped the ball. Our expectation is excellent customer service. Your absences on leave have caused a lot of things to be left undone. We have had to have other people cover your work while you are gone." Traxler Aff. at 36. When Veach asked if Traxler was distressed, Traxler told Veach and Nutting about her mother's poor health and need for Traxler to care for her, about Traxler's mental health problems, that the haphazard training and comments made Traxler nervous, and that Traxler needed time off work because her anxiety symptoms were increasing. Veach said that she did not want to hear about Traxler's mental health problems and that she had better not take any more time off from work. Nutting said she would take over training but did not want to hear about Traxler's medical leave or her reasons for missing work.

Aab told Traxler that they would continue to try to accommodate her FMLA needs in the best manner possible. Traxler believed that Aab meant her ill-will in making this comment. Ott

told Traxler that it was too hard to deal with management issues in her personnel unit when Traxler was absent.

Traxler provided copies of extremely positive performance reviews ranging from 1987 to 2002. She was first diagnosed with major depressive disorder in 1996 by psychiatrist Dale Norma, who later also diagnosed generalized anxiety disorder, panic disorder, obsessive compulsive disorder, and post traumatic stress disorder. Despite her mental health symptoms, Traxler claims to have performed all of the essential functions of all positions she held while working for Multnomah County.

Traxler told some of her supervisors, including Bisson, Kennedy, and Ott about her depression, anxiety disorder, obsessive compulsive disorder, and how the illnesses impacted her life and work. Kennedy and Ott did not say anything and gave Traxler looks of distaste. Ott complained about Traxler's messy desk, which she could not clear up because of her obsessive compulsive disorder. Kennedy told Traxler that her mother's health issues had no bearing on what went on at work, even though Traxler was taking family medical leave to care for her mother. Kennedy was very nasty to Traxler, causing her to start having panic attacks at work. Kennedy was eventually moved to Central HR because, according to Ott, Kennedy created a hostile work environment for Traxler and others. Traxler told Ott that she wanted a workplace free of harassment and retaliation and did not want people at work talking about her mental health issues. Ott warned Traxler not to discuss her anxiety and depression with anyone at work because it was embarrassing and frightening for employees to hear this about a manager. None of Traxler's superiors ever started an interactive process with her to see if she needed any accommodation.

Beginning in the early 1990s, Traxler also notified her managers about her mother's serious health problems. Traxler started taking family medical leave to care for her mother in 2002. All supervisors prior to Ott allowed Traxler to flex her hours to care for her mother. She had also been allowed to flex her time to care for her dying grandmother. Traxler was not allowed to flex her hours in the Central HR Recruiting position because she was classified as exempt with overtime. Her prior management positions were not paid overtime because she was classified as an exempt salaried employee. Also, Traxler directly supervised Payroll employees so Yantis wanted Traxler at work during the hours the employees worked.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    Oregon Tort Claims Act

Traxler alleges claims for disability discrimination under ORS 659A.100, violation of the OFLA under ORS 659A.150, age discrimination under ORS 659A.030, and a violation of the Oregon Whistleblower Law, ORS 659A.230.

The County moves for summary judgment against the state disability discrimination, age discrimination, and whistleblower claims because it contends that Traxler did not provide adequate notice under the Oregon Tort Claims Act ("OTCA"), thus depriving this court of jurisdiction over those claims.

Traxler argues that the County received actual notice of her tort claims through the combination of her former counsel's extensive discussion of the claims with County counsel, followed by an email communication which included Traxler's specific demands for an amicable resolution.

On June 24, 2005, after Traxler's layoff but prior to her termination, her lawyer, Bernie Levy, sent the County's counsel a four-page email which listed what Traxler wanted "in terms of resolving termination issues":  reinstatement, a written apology, funds to compensate for trauma and humiliation, and the opportunity to review documents and information kept by the MCSO when it boxed Traxler's personal effects.  Morf. Decl. Ex. 3 at 1.  The letter recounted what occurred on the day Traxler was laid off and complained that the "termination and manner in which it was handled include serious legal implications and wrongful actions committed on the part of the Sheriff's Office."  Id. at 3.  Her complaints to several MCSO managers concerning poor use and reporting of resources and personnel time were described with the comment that the "timing of her termination is, therefore, suspect and could smack of pretext."  Id.  Further, he charged that the MCSO's handling of Traxler's personal effects was "contrary to law and a misappropriation of personal property."  Id.  In addition to the letter, Levy had spoken for over an hour to the County's counsel "in extensive conversations concerning the substance and reasons" for Traxler's claims.  Levy Aff. ¶4.  Levy states that they discussed Traxler's

disability and her Post Traumatic Stress Disorder; the County's failure to reasonably accommodate Ms. Traxler regarding her disability, including a hostile work environment and retaliation against her; violation by the County of FMLA and OFLA; some discussion of age discrimination; "whistle blowing" by Ms. Traxler concerning overtime abuse and waste of public resources; and the adverse effect of the County's wrongful conduct on Ms. Traxler's health and well being.

Id. He adds that he stopped representing Traxler "when it became apparent that her claims were going to result in litigation and helped find new counsel to proceed to litigation." Id. ¶ 3.

On December 14, 2005, after Traxler's termination, she personally sent the County a letter which states, in part:

> Please accept this as formal notice of my intent to file a tort claim against Multnomah County and against Multnomah County Sheriff Bernie Giusto. . . .
>
> I was employed with the Sheriff's Office from June 1987 until the end of June, 2005. At time of discharge I was an exempt, management employee. I allege unlawful employment discrimination based on use of intermittent leave for several claims approved under the Oregon Family Medical Leave Act. I allege further unlawful discrimination based on questions posed and complaints made in 2005 concerning how my time was being charged–questions posed to the Sheriff's Office HR Director as well as to Central HR, questions to which I was never given a clear answer and eventually resulting in retaliatory, disparate treatment and dismissal.

Morf. Decl. Ex. 4. The letter continues with complaints about charging OFLA leave time against Traxler's sick leave, about being placed on administrative leave at the time of the layoff, and about her "personal feelings worth mentioning about management of the agency." Id.

The County acknowledges that the December 14 letter provides actual notice of the OFLA claim but notes that the letter is silent about any facts giving rise to disability, age, or whistleblower claims.

"Pleading and proof of notice sufficient to satisfy the requirements of ORS 30.275 are a mandatory requirement under OTCA." Brinkley v. Oregon Health Sciences University, 94 Or.

Page 14 - OPINION AND ORDER

App. 531, 537, 766 P.2d 1045 (1988) (internal quotation omitted).  The OTCA defines "actual

notice" of a claim as:

> any communication by which any individual to whom notice may be given . . .
> acquires actual knowledge of the time, place and circumstances giving rise to the
> claim, where the communication is such that a reasonable person would conclude
> that a particular person intends to assert a claim against the public body or an
> officer, employee or agent of the public body . . . .

ORS 30.275(6).  A plaintiff must provide facts relating to the specific claim or claims but only

has to "convey an intent to assert a claim" in general terms and is not required to provide the

specific nature or theory of the claim or claims.  Flug v. University of Oregon, 335 Or. 540, 553,

73 P.3d 917 (2003).  Plaintiff's counsel in Flug sent three letters to defendant and defense

counsel.

> Although the letters stated that defendant's demand for doctors' releases was
> unlawful, and that other demands and conditions imposed by plaintiff's
> supervisors were unreasonable, the import of those statements merely is that
> plaintiff regarded that behavior as contrary to law or unfair, not that plaintiff
> intended to sue over those matters.

Id. at 554.

As in Flug, Levy's email does not convey an intent to sue even though it characterizes

much of the MCSO's behavior as unreasonable and contrary to law.  Levy's description of the

phone calls also does not support the conclusion that the County got actual notice that Traxler

intended to sue.  This conclusion is bolstered by Levy's statement that he stopped representing

Traxler when it became apparent that her claims would result in litigation.  His communications

with County counsel necessarily took place during his representation, prior to litigation becoming

apparent even to Levy.

The December 14 letter from Traxler herself clearly states the intent to file a tort claim. It is focused entirely, however, on the facts concerning her family medical leave claims. I do not think it is reasonable to conclude that the County received actual notice from a combination of this letter with the email. Nearly six months passed between the two. Traxler was apparently no longer represented by Levy when she sent the letter herself. The letter says nothing about the facts underlying Traxler's claims other than under the family medical leave act. A reasonable person would not conclude that Traxler intended to file suit on claims which she no longer discussed.

Accordingly, I conclude that Traxler has not met the OTCA notice requirements for the state claims other than the OFLA claim. I grant summary judgment against the state disability discrimination, age discrimination, and whistleblower claims.

II.    Disability Discrimination

Traxler alleges claims for disability discrimination under the Americans with Disabilities Act ("ADA") and ORS 659A.100, specifically, that she was laid off and terminated because of her disability. Plaintiff's counsel confirmed in oral argument that both the layoff and the termination were allegedly caused by disability discrimination.

The County contends that Traxler cannot establish her prima facie case because she is not a disabled person as defined under the ADA. At her deposition, Traxler identified her disabilities as depressive disorder, anxiety disorder, panic disorder, post traumatic stress disorder, and obsessive-compulsive disorder. The County argues that none of them rise to the level of substantially limiting Traxler in the major life activities of sleeping, thinking, or interacting with others.

Traxler argues that her psychological disorders are long-lasting, are severely impairing if untreated, and cannot be completely cured or controlled even when treated with medication. She claims that her ability to sleep and to think are sufficiently limiting to put her within the definition of disabled under the ADA. Traxler contends that her ability to interact with others was aggravated by working in an environment where people are hostile and unsupportive.

The ADA prohibits discrimination against a qualified individual with a disability. 42 U.S.C. § 12112(a). "Disability" is defined in part as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." Id. § 12102(2)(A).

The federal regulations that implement the ADA state that the term "substantially limits" means:

> (I) Unable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i)-(ii). The court must also consider "the mitigating measures the person uses, their effectiveness, their side effects and their burdens" when addressing what limitations the individual actually faces. Fraser v. Goodale, 342 F.3d 1032, 1039 (9th Cir. 2003), cert. denied, 541 U.S. 947 (2004).

A.    Sleeping

Traxler's depression affected her ability to sleep. Beginning in 1996, Traxler slept two to four hours a night the majority of the week. She tried to go to bed at a normal bedtime but would wake up. Traxler felt drowsy at work but continued to do her work by drinking coffee.

Sleeping is a major life activity.  Head v. Glacier Northwest Inc., 413 F.3d 1053, 1060 (9th Cir. 2005).  The plaintiff in Head would "pass out" for a while immediately after getting home from work, would get five or six hours of sleep a night even when using sleep medications, was drowsy during the day due to the medications and lack of sleep, and some nights could not get to sleep for hours or even at all.  The court held that this was sufficient to raise a genuine issue of material fact on whether the plaintiff was substantially limited in the major life activity of sleeping.  Id.  Cf. Pack v. Kmart Corp., 166 F.3d 1300, 1306 (10th Cir.) (plaintiff not substantially limited in sleeping when during a 13 month period she slept two or three hours some nights, awoke without feeling rested, felt extremely drowsy and sleepy all the time, and took prescription sleep medication), cert. denied, 528 U.S. 811 (1999); Swanson v. University of Cincinnati, 268 F.3d 307, 316 (6th Cir. 2001) (plaintiff not substantially limited when he slept four to five hours a night).

People need different amounts of sleep to feel rested.  Traxler's situation is not as bad as the plaintiff in Head–Traxler does not "pass out" after getting home from work, does not suffer nights without any sleep, and must have a few nights a week when she sleeps adequately because she claims sleeping difficulties only for the majority of the week.  Both felt drowsy during the day.  Traxler fought her drowsiness with coffee sufficiently to do a good job at work, up to her transfer to Recruiting.  There is no evidence that Traxler needed to take naps to catch up on her sleep.

It is difficult to compare Traxler with Pack because Pack is not clear on how many nights the plaintiff slept only two or three hours.  Compared to Swanson, who was not substantially limited when sleeping four to five hours each night, Traxler's pattern of two to four hours of

sleep the majority of the week, and presumably normal sleep the remainder of the week, is equivalent.

Moreover, sleeping difficulties are not uncommon. "While less then five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population." Swanson, 268 F.3d at 316. Based on this comparison with the case law, I conclude that Traxler has not raised a factual issue that she is substantially limited in sleeping.

B.    Thinking

Traxler's depression affected her ability to concentrate, remember things, and focus. She would find herself ruminating and thinking of other things. Her obsessive compulsive disorder caused her to obsess over detail, ruminate about processes, ensure that everything is correct, and hoard documents. Traxler's concentration problems sometimes happened every day at work. She had headaches three or four times a week. She first noticed the problem in 1996 and kept notes to allow her to do her job. Traxler never received any negative feedback at work, until her last position in Central HR Recruiting. Traxler described herself while an HR Manager 1 as a good supervisor and manager of employees whose work was thorough, detail-oriented, and comprehensive.

Thinking is a major life activity. Head, 413 F.3d at 1061. The plaintiff in Head could not stay focused for more than brief periods, did not have much of a short-term memory at all, had to be repeatedly reminded of appointments or tasks, could only look at written material for short periods or it became jumbled, could not focus on an entire television show, and had to quit school because of inability to concentrate. The court found that he was substantially impaired. Id.

Page 19 - OPINION AND ORDER

In comparison, Traxler worked in a professional job since 1996 and performed what she described as thorough, detail oriented, and comprehensive work. It is true that Traxler mitigated her thinking problems by keeping extensive notes, but she was successful in doing so. I conclude that Traxler has not raised a factual issue that she is substantially limited in her ability to think.

C.      Interacting with Others

Traxler's depression affected her ability to engage in social interactions and office recreation types of activities, such as potlucks. She felt disinclined to participate; felt anxiety, depression, and fear; wanted to hold back; and was a little shy. Traxler felt that she was targeted routinely for not participating in things. Once Traxler was criticized extensively for not sitting with the rest of her group at a training session. At times she would go out for coffee or lunch with people in her unit or other friends and at other times she went alone. Traxler joined others for lunch a couple of times a week, maybe more, but some weeks stayed to herself. Traxler performed her job but thinks that people did not understand why she acted at times in ways that others perceived as rigid, impatient, or irritable.

Interacting with others is a major life activity. Id. at 1060. For the limitation of interacting with others, "a plaintiff must show that his 'relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.'" McAlindin v. County of San Diego, 192 F.3d 1226, 1235 (9th Cir. 1999) (quoting EEOC on Psychiatric Disabilities at 5), am. on other grounds on denial of reh'g, 201 F.3d 1211, cert. denied, 530 U.S. 1243 (2000).

The court found the plaintiff in Head to be substantially impaired in interacting with others. The plaintiff avoided crowds, stores, large family gatherings and doctor's appointments;

would not leave the house most weekends before being fired and would not leave the house for

weeks on end after the firing; and avoided telephone interaction unless there were serious

consequences for not responding to phone calls.  This behavior occurred "many times" or "most"

of the time.  Id. at 1061.

In contrast, Traxler continued her employment and cared for her mother, including taking

her to doctor's appointments.  Although there were weeks when Traxler did not join others for

coffee or lunch, there were also weeks when she did so a couple of times a week.  There is no

evidence that Traxler hid in her home or avoided phone calls at all.  Although Traxler was not

comfortable interacting at times, she was not significantly restricted and was much less restricted

than described in Head.  There is no evidence of consistently high levels of hostility, social

withdrawal, or failure to communicate when necessary, as discussed in McAlindin.  I conclude

that Traxler has not raised a factual issue that she is substantially limited in her ability to interact

with others.

      D.    <u>Summary</u>

Traxler has not produced enough evidence to create a factual issue that she was

substantially limited in one or more major life activities.  Consequently, she is not a disabled

person under the ADA.  I grant summary judgment against the claim.

III.   <u>Age Discrimination</u>

Traxler alleges that she was terminated because of her age, in violation of the Age

Discrimination in Employment Act ("ADEA").  Counsel confirmed during oral argument that the

age discrimination claim concerns only the layoff and not the termination.

A.    <u>Prima Facie Case</u>

The County moves for summary judgment against the ADEA claim because it contends that Traxler cannot establish two prongs of the prima facie case–that she was completing her job satisfactorily and that she was replaced by a younger employee.

Traxler contends that her solid performance from 1989 to 2005, until she moved to the HR Analyst 2 recruiting position, satisfies the prima facie element that she was completing her job satisfactorily.  Traxler maintains that courts treat the element of replacement by a younger employee with flexibility, and that she can alternatively show that the payroll supervision duties were still being performed even though the position was not filled until February 2006 with Lori Sander, who was younger.

The ADEA makes it unlawful for an employer to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age.  29 U.S.C. § 623(a)(1).  Protection under the ADEA extends to all individuals who are at least 40 years old.  29 U.S.C. § 631(a).  The order and allocation of proof in cases under Title VII of the Civil Rights Act applies to age discrimination claims under the ADEA, which may be proven by direct or circumstantial evidence.  <u>Enlow v. Salem-Keizer Yellow Cab Co., Inc.</u>, 389 F.3d 802, 812 (9th Cir. 2004), <u>cert. denied</u>, 544 U.S. 974 (2005).

To establish a prima facie case of age discrimination, a plaintiff must produce enough evidence at summary judgment for the trier of fact to infer the fact at issue.  The elements are that plaintiff:  (1) was a member of the protected class (age 40-70); (2) was performing the job in a satisfactory manner; (3) was discharged; and (4) replaced by a substantially younger employee

with equal or inferior qualifications. <u>Nidds v. Schindler Elevator Corporation</u>, 113 F.3d 912, 917

(9th Cir. 1996), <u>cert. denied</u>, 522 U.S. 950 (1997).

> At summary judgment, the degree of proof necessary to establish a prima facie
> case is "minimal and does not even need to rise to the level of a preponderance of
> the evidence." <u>Lyons v. England</u>, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting
> <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994)).

<u>Dominguez-Curry v. Nevada Transp. Dept.</u>, 424 F.3d 1027, 1037 (9th Cir. 2005).

The fourth element has been applied with flexibility, particularly when the termination is

due to a reduction in force for business reasons.  The plaintiff may show that the discharge

occurred "under circumstances giving rise to an inference of age discrimination." <u>Nidds</u>, 113

F.3d at 917.  One way to establish this is to show that the employer had a "continuing need for

his skills and services in that his various duties were still being performed." <u>Id.</u>

Now that Traxler limited her ADEA claim to her layoff from Payroll, she has established

the prima facie element that she was performing the job in a satisfactory manner.  Aab and Yantis

believed that she was doing a good job in Payroll.  Nobody had any complaints about Traxler's

performance until she moved to the Recruitment position.

The issue then is whether she was replaced by a substantially younger employee with

equal or inferior qualifications, in light of the reduction in force.  There is no evidence that any of

Traxler's duties in Payroll were no longer performed after she was laid off.  Yantis, who is older

than Traxler, claims that she took over all duties for a while and then delegated some of the

nonmanagerial jobs to Sander.  Sander, who is younger than Traxler, clearly started performing

some of Traxler's tasks.  There is a factual issue on how the duties were divided.  Because the

degree of proof on a prima facie element is so low, I conclude that Traxler has established this

prima facie element sufficiently to survive summary judgment.

B.      Pretext for the Termination

Even if Traxler can establish a prima facie case, the County maintains that she cannot demonstrate that her layoff for budgetary reasons is a pretext for age discrimination.

Traxler contends that the fact that after her layoff from the Payroll Manager position, she was escorted from the facility two weeks before the budget cycle ended allows the jury to infer that the County's budgetary reason for her layoff is a pretext for discrimination.  The County put Sander in Traxler's position as Payroll Manager later in the same fiscal year in which Traxler was laid off from the position to save money.  Traxler also relies on the fact that Ott was named as interim HR Director, even though Traxler was the highest ranking Human Resources Manager under the Director and the logical choice.  Ott was chosen as the permanent replacement over another candidate, Arnold Quigley, who was in his late 40s or 50s and had more knowledge, skills, and experience than Ott.  Traxler also states that unnamed people told her she was rigid, inflexible, and old school and expected creative solutions from her.

The County notes that Aab's practice is to escort from the building all people who were just laid off.  The County argues that whether the practice is the best one is not the issue.  The County also notes that Traxler did not apply for the HR Director position.

> If established, the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff.  Id.  The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action.  Id.  If the employer meets this burden, the presumption of unlawful discrimination "simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The plaintiff then must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination.  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).

Dominguez-Curry, 424 F.3d at 1037.

Page 24 - OPINION AND ORDER

"When evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal *prima facie* case based on a McDonnell Douglas type presumption." Wallis v. J.R. Simplot Co., 26 F.3d 885, 890-91 (9th Cir. 1994). Plaintiff's own assertion of superior qualifications is insufficient without additional evidence. Blue v. Widnall, 162 F.3d 541, 546 (9th Cir. 1998). Plaintiff is not required, however to produce additional, independent evidence of discrimination at the pretext stage if the prima facie case raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. Chuang v. University of California Davis, 225 F.3d 1115, 1127 (9th Cir. 2000). "[A] plaintiff can prove pretext in two ways: (1) *indirectly*, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) *directly*, by showing that unlawful discrimination more likely motivated the employer." Noyes v. Kelly Services, 488 F.3d 1163, 1170 (9th Cir. 2007) (internal citation and quotation omitted). "[I]n the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006) (noting tension with the Godwin v. Hunt Wesson, Inc., 150 F.3d 1217 (9th Cir. 1998), line of cases and their standard requiring specific and substantial circumstantial evidence of pretext).

I do not think it is reasonable to infer a discriminatory basis for Aab's decision to escort Traxler and Nykerk from the building and place them on administrative leave immediately on notifying them of their layoffs. Although this practice is upsetting both to the employee being escorted out and to their friends in the workplace, it is practice followed by many employers.

There is no evidence that Aab ever varied from it, although I acknowledge that he may not have laid off any other employees during his tenure.

I also am not persuaded that Ott's appointment as the interim HR Director and eventual appointment to the permanent position is evidence of pretext. Ott had been part of Giusto's transition team and was put into the interim position when Giusto did not keep Bisson in the job after taking office. There is no evidence that Traxler asked to be considered for the interim position. Neither Ott nor Traxler applied for the permanent position. Aab explained that the selection process for the permanent position considered several people who did apply, none of whom were deemed suitable. With no other prospects, Giusto encouraged Ott to apply for the permanent position. Although Ott did not have all the skills Aab wanted, she had demonstrated to Aab while performing the interim position that she could develop the skills. Combined with what would have appeared to management that Traxler was not interested in the job, I conclude that Ott's appointment is not evidence of pretext.

Traxler also contends that others complained that she was rigid and inflexible, traits that can be associated with older people. Again, I am unpersuaded by this argument. First, the stereotype that only older people are rigid and inflexible is inaccurate. Second, Traxler does not say who made these comments to her. There is no evidence that any of the remarks came from Aab or people who influenced him.

There is no dispute that the MCSO had to cut some positions for budget reasons, as was the case for several previous years. The question is whether the decision to cut Traxler's position was because of age discrimination. Traxler has failed to raise a factual reason that the stated

reason is a pretext for discrimination.  Consequently, I grant summary judgment against the ADEA claim.

IV.    <u>Family Leave Claims</u>

Traxler alleges that the County violated the Family and Medical Leave Act ("FMLA") and the Oregon Family Leave Act ("OFLA") by interfering with her, discriminating against her, and retaliating against her for taking family medical leave.  Counsel confirmed during oral argument that both the layoff and the termination are adverse employment actions which violate the family leave laws.

A.    <u>FMLA Interference Claim</u>

The County moves for summary judgment against the FMLA interference claim because it contends that Traxler cannot demonstrate that taking protected leave constituted a negative factor in her layoff and termination.  The County argues that comments on the fact that Traxler was out of the office do not amount to interference with FMLA rights because there is no evidence that the County discouraged Traxler from taking leave by interfering with the length and dates of leave or by denying leave outright.  According to the County, there is no evidence that Traxler's medical leave was considered when she was selected for layoff or when she was terminated.

Traxler contends that there is evidence that her taking of FMLA-protected leave constituted a negative factor in her layoff.  She notes that she took family leave during the first six months of 2005 and was laid off at the end of the period.  Traxler notes that the other employee who was laid off, Nykerk, also took a great deal of FMLA leave.  She argues that Ott,

Veach, Nutting, and Aab were all critical of her taking family leave. The 2005 Letter of Expectations expressed concern that she had missed 32.5% of work time.

The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). This provision is violated "by engaging in activity that tends to chill an employee's freedom to exercise his [] rights." Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1123 (9th Cir. 2001). Examples of interference include denying leave, discouraging an employee from using leave, and using the taking of leave as a negative factor in employment actions. Xin Liu v. Amway Corp., 347 F.3d 1125, 1133 (9th Cir. 2003). To prevail on an FMLA interference claim resulting in termination, a plaintiff "need only prove by a preponderance of the evidence that . . . taking of FMLA-protected leave constituted a negative factor" in an employment decision. Bachelder, 259 F.3d at 1125 (explaining why *McDonnell Douglas* burden shifting approach would not be used).

Traxler has submitted enough evidence to create a factual issue that the County interfered with her rights under the FMLA by complaining about the number of FMLA leaves Traxler had used, by expressing concern in the 2005 Letter of Expectation about the amount of time she had missed work when most or all of the time was protected leave, and by complaining that Traxler dropped the ball when out on leave. These actions could be enough to discourage an employee from continuing to take intermittent leave. There is also enough evidence for a jury to conclude that Traxler's use of FMLA leave was a factor in her layoff or termination, based on the proximity in time and the obvious displeasure some of her supervisors showed concerning the

leaves.  Although Aab's remark was innocuous and Brown did not comment, they could have been biased by Ott, Veach, and Nutting.

Accordingly, I deny summary judgment against the FMLA interference claim.  The claim will proceed to trial.

B.      FMLA Discrimination and Retaliation Claim

The County argues that under Bachelder v. American West Airlines, Inc., 259 F.3d 1112 (9th Cir. 2001), Traxler's allegation that the County discriminated and retaliated against her by laying her off and terminating her can only support an FMLA interference claim.  Consequently, the County moves to dismiss the FMLA discrimination and retaliation claim.

The FMLA makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).  The Ninth Circuit explains the application of this retaliation provision of the FMLA as follows:  "In this circuit, however, we have clearly determined that § 2615(a)(2) applies only to employees who *oppose* employer practices made unlawful by FMLA, whereas § 2615(a)(1) applies to employees who simply take FMLA leave and as a consequence are subjected to unlawful actions by the employer."  Xin Liu, 347 F.3d at 1133 n.7  (citing Bachelder, 259 F.3d at 1124).

The record contains no evidence of Traxler opposing the County's practices.  When Traxler complained to Veach and Nutting about needing time off to care for her mother and to try to ameliorate her own mental health symptoms, Veach and Nutting shut the conversation down abruptly.  I do not see evidence that Traxler opposed their position or complained about the inability to take leave as needed without consequences.  Thus, her claim is more properly

characterized under <u>Bachelder</u> as an FMLA interference claim.  I grant summary judgment against the FMLA retaliation claim.

V.    <u>OFLA Claim</u>

The County moves against the OFLA claim because Traxler was never denied family leave and the OFLA does not include a cause of action for discrimination or retaliation.

Traxler argues that case law has interpreted the OFLA as including a retaliation cause of action, even though it is not expressly provided for in the statute.  Traxler is correct.

The Oregon Court of Appeals concluded in <u>Yeager v. Providence Health System Oregon</u>, 195 Or. App. 134, 139, 96 P.3d 862 (2004), that OFLA provided an action for retaliation.  The Ninth Circuit concluded that judges in this district erred by not following <u>Yeager</u> when there is no evidence that the Oregon Supreme Court would have decided the issue differently.  <u>Ryman v. Sears, Roebuck and Co.</u>, 505 F.3d 993, 995 (9th Cir. 2007).

Moreover, I note that the Oregon legislature has recently enacted an amendment to the statute, making retaliation a cause of action, and making the amendment retroactive. HB 2635-A, 74th Leg., Reg. Sess. (Or. 2007) (amending ORS 659A.183(2) to read "It is an unlawful employment practice for a covered employer to [r]etaliate or in any way discriminate against an individual . . . because the individual has inquired about the provisions of [OFLA], submitted a request for family leave or invoked any provision of [OFLA].").  The amendment became effective January 1, 2008.  http://www.leg.state.or.us/07reg/pubs/enact.pdf.  For the reasons stated under the FMLA interference claim, I deny summary judgment against the OFLA retaliation claim.

VI.    <u>Section 1983 Claim</u>

Traxler alleges the County had a custom or policy which denied her equal protection because of the age and disability discrimination and denied her free speech rights.  Counsel withdrew the equal protection claim during oral argument.  He also confirmed that the First Amendment retaliation claim only concerns the layoff and not the termination.

When Traxler was managing Payroll in 2005 and 2006, she saw abuses in timekeeping and overtime practices by sworn officers that resulted in payment of excessive sick time and overtime pay to officers.  Corrections officers would collect overtime by calling in sick for a shift and working a different shift for another officer in the same 24 hour period.  Recruits at the academy got overtime because break schedules were not done correctly.  Some employees received premium overtime pay for being on call when they were not on call at all.  Traxler reported the abuses to Aab, Ott, Moore, and Graham.  She arranged staff meetings with Yantis to outline problems regarding overtime expenditures.  Traxler could tell from comments to her from MCSO management that her reports of abuse were not welcome.  Graham told Traxler that "he didn't want me upsetting the apple cart and he didn't want to hear the answer 'no' from me.  He said that he simply wanted me to figure out ways to get around the rules and accomplish what he wanted which was a hands off approach on sworn officer overtime abuse."  Traxler Aff. at 21.

Traxler continued her reports of fraud, waste, and abuse issues.  She also questioned the purchase of a timekeeping system for the MCSO that was parallel to the County's system, something Traxler believed wasted a lot of staff time.

Page 31 - OPINION AND ORDER

Traxler argues that her speech is constitutionally protected because she complained to many of the County managers about abuse of overtime by corrections officers, payroll and budget concerns, and financial waste–all matters of public concern.

I will rely on the County's argument that Traxler did not engage in any protected speech, due to the nature of her job duties.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employee discipline." Garcetti v. Ceballos, 547 U.S.410, 126 S. Ct. 1951, 1960 (2006) (deputy district attorney did not engage in protected speech when he wrote a memo recommending dismissal of a case due to problems with the search warrant affidavit).

Traxler characterizes her Payroll position as follows:  "While working as the manager of the Payroll Unit, I solved staff problems, resolved interpersonal conflict in the unit, corrected or tried to correct inefficiency, provided internal customer service, tried to provide order and direction to employees, and reviewed policies and procedures."  Traxler Aff. ¶ 60.  Her reports of overtime, sick time, and comp time abuse, as well as her concerns and questions about the new timekeeping system, all fall within her official duties as the manager of Payroll.  Consequently, her speech is not protected by the First Amendment and the § 1983 retaliation claim fails, even assuming that Traxler was laid off due to her complaints.  The County, acting as an employer, may discipline, or react in other ways, because of how an employee performs assigned duties. When Traxler spoke about these concerns, she was speaking as the Payroll Manager and not as a citizen.

Accordingly, I grant summary judgment against the § 1983 claim for First Amendment retaliation.

## CONCLUSION

Defendant's Motion for Summary Judgment (#34) is granted in part.  The FMLA interference and OFLA retaliation claims may proceed to trial.

IT IS SO ORDERED.

Dated this _____29th_____ day of January, 2008.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge